Patricia Barlow State Bar #135637
BARLOW LAW
1611 Jackson Street
San Francisco, California 94109
Ph(415) 977 1107 Fax (415) 977 1111
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

MATTHEW CHARLES MITCHELL    )    CASE NO.
)
       Plaintiff,    )    **IN ADMIRALTY**
vs.    )
)    **SEAMAN'S VERIFIED COMPLAINT**
ORACLE RACING, INC. A    )    **FOR DAMAGES ALL WITHOUT**
California Corporation d/b/a  )    **PAYMENT OF COSTS, 28 U.S.C.**
ORACLE TEAM USA    )    **Section 1916**
)
       Defendant    )    **VERIFIED COMPLAINT – FILED**
_____)    **CERTAIN PARAGRAPHS UNDER SEAL**

1. Plaintiff MATTHEW CHARLES MITCHELL (hereinafter "plaintiff") brings this action for compensatory, economic and punitive damages based on his damages sustained against defendant ORACLE RACING, INC. d/b/a ORACLE TEAM USA (Hereinafter "defendant" or "OTUSA"). This lawsuit arises out of the actions/inactions of defendant in **failing to terminate or suspend the employment** of OTUSA grinder Simeon Tienpont between July 27, 2013 and September 3, 2013 when, through management, OTUSA learned that Simeon Tienpont had admitted that he had added weight with resin to the forward kingpost of the AC45 vessel known as "the BAR boat" in violation of the AC45 Class Rule Version 1.0 Rules C.1.2(f) and C.1.5. (Attached as **EXHIBIT A** is a true and correct copy of the AC45 Class Rule Version 1.0 Approved on May 4, 2011)

2.    This lawsuit also arises out of the **deliberate concealment by OTUSA's management** when it learned that Simeon Tienpont had added weight to the forward kingpost of the BAR Boat, and OTUSA willfully, deliberately, without due care and with complete disregard of its duties of good faith and fair dealing owed to plaintiff, failed to come forward and make this information available to the AC45 Jury investigating and prosecuting claims with penalty powers (sitting as an arbitration panel) against certain of defendant's sailing team and shore crew hired for the 34th America's Cup held in San Francisco in September 2013, including plaintiff, in a case called "Jury Case AC31".

3. In **failing to terminate or suspend the employment** of OTUSA grinder Simeon Tienpont, and at a minimum without due care, **deliberately concealing and failing to report** Simeon Tienpont's admission of adding weight to the subject kingpost (and violating the AC45 Class Rule) to the 34th America's Cup Jury in Jury Case AC31 ("the jury"), and earlier before the Jury heard evidence, defendant proximately caused injuries and damages to plaintiff, as plaintiff was wrongly accused of adding weight to the forward kingpost on the BAR boat and penalized by the jury, as a consequence of defendant's inactions.

4.    Plaintiff seeks damages resulting from defendant's wrongful actions including, loss of reputation associated with good sportsmanship and receipt of a sports penalty, emotional and mental distress and suffering, anguish, economic losses, compensatory and punitive damages.

<u>**PARTIES, JURISDICTION, AND VENUE**</u>

5.    This District Court has original jurisdiction over this claim

VERIFIED COMPLAINT                                                    2

based on its admiralty jurisdiction under 28 U.S.C. Section 1333. This is a lawsuit arising out of a maritime contract and involving subject matter concerning the maritime activity of sailing on navigable waters.

6.   Plaintiff is a seaman and a ward of this Admiralty Court, and elects to take advantage of the provisions of 28 U.S.C. Section 1916 to proceed without prepayment of costs or fees.

7.   Plaintiff brings and maintains this admiralty suit under general maritime law as a suit for damages for the loss of his future contractual wages and damages resulting from defendant's breach of its maritime employment/services contract with plaintiff; and further, under that contract, for defendants' breach of OTUSA's implied contractual duty to act in good faith and to deal fairly in performing and enforcing its maritime employment/services contract with plaintiff; and for defendants negligent retention of Simeon Tienpont to the detriment of plaintiff.

8.   This District Court alternatively has original jurisdiction over this claim on the basis of diversity of citizenship under 28 U.S.C. Section 1332, being an action between a citizen of this state and a citizen of a foreign state and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.   Plaintiff is an individual New Zealand national and citizen whose principal and permanent residence is located at Manly, Auckland, New Zealand.

10.  Defendant Oracle Racing, Inc., doing business as ORACLE TEAM USA, presently is and has been a California Corporation since June 20, 2000, designated Business Entity # C2249743 by the California Secretary of State, with its principal offices located at Pier 80,

999 Marin Street, San Francisco, California 94124 and 101 Ygnacio Valley Road, Suite 320, Walnut Creek, California 94596 and at all material times herein is acting by and through its officers, agents, servants, employees, representatives, General Counsel  Sam Hollis (not admitted as a member of the California Bar), CEO Russell Coutts, General Manager Grant Simmer and Master James Spithill, and is doing business in the Northern District of California. Its designated agent for service in California is Paul T. Martinelli.

11.    Plaintiff brings this action seeking compensatory, economic and punitive damages including damages for loss of wages and contract value, loss of career media exposure,  emotional and mental distress, damages to reputation, embarrassment, humiliation, fright, shock, loss of reputation in the international professional sailing community, and denial of social pleasure and enjoyment, damage to plaintiff's professional reputation resulting in negative damage to plaintiff's career locally and internationally and other damages.

12.    Venue lies within this judicial district pursuant to the provisions of 28 U.S.C. Section 1391(b)(1).

**INTRODUCTORY BACKGROUND INFORMATION**

**THE 100 GUINEA CUP- THE AMERICA's CUP**

13.  Some historical background on the America's Cup  - the most prestigious yachting regatta in yachting history – is appropriate as the background against which plaintiff's damages and the context of this lawsuit must be viewed.

14.  The America's Cup is the oldest trophy in world sport. The first race was organized by the Royal Yacht Squadron in England in August, 1851. It was a single race around the Isle of Wight, open to yachts of all nations. The prize was a silver Cup that was valued at

One Hundred Guineas. On that day in 1851 a radical looking black schooner called "America" ghosted out of the afternoon mist and swiftly sailed past the Royal Yacht between the Isle of Wight and the south coast of England, on an afternoon when Queen Victoria was watching the sailing race. As the schooner passed the Royal Yacht in first position, and saluted by dipping its ensign three times, Queen Victoria asked one of her attendants to tell her who was in second place. "Your Majesty, there is no second," came the reply. That phrase, just four words, is still the best description of the America's Cup, and how it represents the singular pursuit of excellence.

15. That August day in 1851, the yacht "America", from the New York Yacht Club, would go on to beat the best the British could offer and win the Royal Yacht Squadron's "100 Guinea Cup", winning this contest of maritime supremacy. This symbolized a victory for the new world over the old, a triumph that unseated Great Britain as the world's undisputed maritime power, and the America's Cup, was born, named after the winning schooner "America", not the country.

16. Shortly after America won the 100 Guinea Cup in 1851, New York Yacht Club Commodore John Cox Stevens and the rest of his ownership syndicate sold the celebrated schooner and returned home to New York as heroes. They donated the trophy to the New York Yacht Club under a Deed of Gift, which stated that the trophy was to be "a perpetual challenge cup for friendly competition between nations." and thereby became a challenge trophy, open to sailing clubs of all nations. American teams representing the New York Yacht Club successfully defended the America's Cup against all challenges for 132 years – the longest winning streak in sport – until an Australian team led

by Alan Bond won the America's Cup in 1983 off Newport, Rhode Island.

17.   Since then the America's Cup has become a truly global phenomena, with challenges from all five continents, and held in locations spread around the world – Cowes, New York, Newport RI, Fremantle, San Diego, Auckland, Valencia and in September 2013 in San Francisco.

18.   The America's Cup is without a doubt the most difficult trophy in sport to win. In the more than 150 years since that first race off the English coast, only four nations have won what is often called the "oldest trophy in international sport." For some perspective, consider that there had been nine contests for the America's Cup before the first modern Olympic Games were held in Athens in 1896.

<div align="center">

**GENERAL ALLEGATIONS**

</div>

19.   On or about September 1, 2012 plaintiff entered into a maritime services contract with OTUSA entitled "Oracle Racing, Inc. Employment Agreement Matthew Mitchell Sailing Team". This contract was for plaintiff to provide sailing services for the 34th America's Cup and associated sailing regattas in preparation of the defense of the 34th America's Cup in San Francisco, California. (Attached as **EXHIBIT AA** is a true and correct copy contract entitled "Oracle Racing, Inc. Employment Agreement Matthew Mitchell Sailing Team" signed on May 22, 2013 but commencing on September 1, 2012)

20.   Under this agreement, plaintiff agreed to be bound by the applicable rules, protocols and regulations of the "regatta".

21.   In 2013 there were various regattas at different locations involving a class of race boat known as an "AC45" which was a 45

foot multi hull yacht. There were three AC45 boats that OTUSA entered in pre-America's Cup lead up regattas called the America's Cup World Series, and they were identified as Boat's 4 and 5 and the BAR boat.

22.   Boats 4 and 5 had sailed in regattas in Newport RI and elsewhere in the early part of 2012. After the Newport regatta, the youngest sailor on defendant's sailing team, Kyle Langford, was going back to OTUSA's compound at Pier 80, San Francisco and he was going to be part of a group that was to put the BAR boat together to sail in a regatta. The BAR boat was to come out of a container at Pier 80 in San Francisco and then be assembled for racing.

23. Kyle Langford, wanting to be helpful, put a job list together of the jobs that needed to be completed in the assemblage of the BAR boat. Kyle Langford was aware that the kingpost on the AC45 Boat 4 which OTUSA raced earlier at the Newport Regatta had weight added to the kingpost. (Attached as **EXHIBIT AB** is a true and correct copy of the AC45 Jury's Case Transcript of Proceedings in Jury Case AC31 ("Transcript of Jury's Proceedings") pp. 410:18 to 412:14; 418:17-22)(See **EXHIBIT A**, pages 18 and 19 showing diagrams of an AC45 boat with the forward kingpost identified). When Kyle Langford had completed his job list he emailed it to various members of the OTUSA shore team including one of the shore bosses Andrew Henderson a/k/a "Hendo". That job lists stated as one of the items for work "King post added weight". (Attached as **EXHIBIT B** is a true and correct copy of an email dated July 10, 2012) That job list was not copied to plaintiff who was not even in the United States when the job list was circulated as he arrived later on July 15, 2012.

24. Once Andrew Henderson received the job list from Kyle Langford

and another list from Dean Curtis, Henderson made some amendments and assigned persons to each of the listed jobs making a "master list" which he put on the rigging container door at Pier 80 from which the BAR AC45 class boat was to be assembled. One of the assignments on this master list was "Fill kingpost" and was assigned by Andrew Henderson's to "Dean," being Dean Curtis. Andrew Henderson emailed this job list with the kingpost filling on it to various shore people and Kyle Langford on July 11, 2012 but it was not copied in Hendo's email to plaintiff. (Attached as **EXHIBIT C** is a true and correct copy of Andrew Henderson's July 11, 2012 email attaching the master job list)

25. With a copy of both Kyle Langford's job list and Andrew Henderson's master job list, shore crew member Bryce Ruthenberg sent an email on July 11, 2012 to OTUSA's Andy Walker and copied the email to Kyle Langford, Dean Curtis and Andrew Henderson which stated **"Let's not forget the lead in both the kingpost and forestay post".** (Attached as **EXHIBIT D** is a true and correct copy of Bryce Rutherberg's July 11, 2012 email with attachments)

26. Subsequent to the creation and exchanges about the filling of the kingpost being on the master job list for the assembly of the BAR boat, to which plaintiff was not included and had no knowledge of, plaintiff arrived in San Francisco on July 15, 2012. OTUSA's General Manager Grant Simmer asked plaintiff to be the Boat Captain of the BAR boat. The Boat Captain is the person on the racing team that links what happens on the water with what happens on the land after the boat is assembled and racing. After sailing, a Boat Captain would discuss items that needed to be addressed by the shore crew, but the Boat Captain was not responsible for everything that

was done on the boat. Also the Boat Captain was different from the skipper or Master who was in charge of the boat and one of the persons that a boat captain answered to.

27. At the time the BAR boat came out of the container at Pier 80 to be assembled, OTUSA had on staff a professional Rules Advisor named Richard Slater whose job was to advise both the shore crew and the sailing team on issues relating to the AC45 class rules and how these rules applied. His job was to ensure compliance with the Rules by educating the team on the Rules and making sure they understood three things which were modifications, replacements and repairs. There was a procedure in place for getting approval for modifications to the boats and Richard Slater would facilitate the approval [with the measurer]. (Attached as **EXHIBIT E** is a true and correct copy of Transcript of Proceeding of the AC34 Jury in Jury Case AC31 pages 141:1 to 142:2; 149:14 to 150:4)

28. When plaintiff arrived in San Francisco on July 15, 2012 the BAR boat was disassembled and in rough condition at Pier 80. At that time he had never assembled or repaired an AC45 boat before. But the OTUSA shore crew had done several regattas with the AC45 class boat, and were fairly experienced at assembling and repairing this class of boat and plaintiff assumed they knew what they were doing. Andrew Henderson who had created the master job list, was an experienced sailor on the sailing team, and on the shore team as the head of rigging.

29. Also around at Pier 80 at this time was sailing team member Simeon Tienpont who was an experienced racing team sailor, who had sailed in at least 4 earlier AC45 regattas, an earlier America's Cup in 2010, and was a Boat Captain on an AC45 (Boat 5), and who came

from a shipbuilding family, and had studied Naval Architecture at the Technical University of Haarlem in the Netherlands. He was the "go to" sailor given his extensive technical knowledge. Simeon Tienpont had assembled at least 3 AC45s and unlike plaintiff was very familiar with the assembly of the AC45 class boat before any assemblage was commenced on the BAR boat.

30. Simeon Tienpont was one of the sailors who worked on the assembly of the BAR boat in July and August 2012. Unlike plaintiff, Simeon Tienpont had earlier been involved in the assembly of an earlier AC45 boat.

31. After starting to work on the BAR boat assembly, plaintiff heard about "Hendo's" master job list on the container door. Plaintiff had no role in preparing that list and he did not understand all the jobs listed, and assumed clearance had been obtained for all listed jobs. Plaintiff did certain jobs on this list including preparing the boat for painting. Plaintiff was not involved in the assembling of the spine, bowsprit, kingposts or the spine cables, (See **EXHIBIT A** pp 18-19 See diagram) nor did he have any knowledge or expertise for that assembly.

32. The person that was doing that work on the spine, bowsprit, kingposts and spine cables was Simeon Tienpont. Plaintiff did not supervise Simeon Tienpont who assembled the spine, while plaintiff primarily assembled the systems. Simeon Tienpont was the experienced hand and a big guy on board and he was the "go-to" guy on methods for the BAR boat.

33. While working on the BAR boat assembly, plaintiff did look at some modifications to the jib and gennaker controls, and had questions on whether the modifications were rule compliant so he

went to Richard Slater who in turn sent the inquiry to Measurer Nick Nicholson who approved the modification. (Attached as **EXHIBIT F** is a true and correct copy of Transcript of Proceeding of the AC34 Jury in Jury Case AC31 pages 472:23 to 474:15; and attached as **EXHIBIT G** is a true and correct copy of an email dated August 9, 2012 from Richard Slater to Matthew Mitchell with a follow through email to the 34th America's Cup Measurer Nick Nicholson)

34. At no time did plaintiff perform any work at all on the BAR boat's kingpost. He had seen the kingpost on a work bench at some point and noticed that it was heavy but saw that the job list said to add weight to the kingpost and assumed that it was approved work. Also Richard Slater was around and had access to the master job list like everyone else at Pier 80 at that time.

35. After the assembly of the BAR boat was completed that boat raced in the America's Cup World Series regatta in San Francisco in 2012.

36. After the  America's Cup World Series regattas were finished and OTUSA was getting ready to race it's 72 foot boat in the 34th America's Cup, its three AC45 boats including the BAR boat were donated to the Red Bull Youth America's Cup series to be sailed in San Francisco Bay.

37. Sometime in late July 2013, it was observed by one of the boat builders involved in the Red Bull series that the OTUSA AC45s were different than other boats because the king posts were heavy. Only the BAR boat was available for inspection and Nick Nicholson, the Chairman of the AC34 Measurement Committee, took possession of the forward kingpost of the BAR boat and he discovered that it was roughly two and a half times heavier than a normal king post. A standard king post -according to Mr. Nicholson - weighs 1.39 kilos

and the kingpost removed from the BAR boat weighed 3.744 kilos. Mr. Nicholson subsequently found that the BAR boat's forward kingpost had "lead in small constituent components that appeared to have been compacted and then a resin plug poured on top of that." He found further that 'It's ..actually just small, granular pieces of lead. It has some magnetic material in there as well. It's not pure lead."(Attached as **EXHIBIT H** is a true and correct copy of the Transcript of Proceeding of the AC34 Jury in Jury Case AC31 pages 9:21 to 10:1; 22:2 to 24:17; 26:14 to 27:23)

38. In anticipation of the 34th America's Cup in San Francisco in 2013, The International Sailing Federation ("ISAF") appointed the 34th America's Cup Jury for purpose of dispute resolution and that Jury was made up of the following members: David Tillett (Chairman); John Doerr; Josje Hofland; Bryan Willis and Graham Mckenzie. ("The AC45 Jury")  The documents establishing and directing the role of the Jury for dispute resolution for the 34th America's Cup included "The Protocol Governing the 34th America's Cup Incorporating Amendments 1-19" ("The Protocol") (A true and correct copy is attached as **Exhibit I**), and "Jury America's Cup Rules of Procedure as Amended on 22nd May 2013" ("Rules of Procedure") A true and correct copy is attached as **Exhibit J**)

39. The Protocol under Article 15.12 provides that the Jury shall act as an "arbitration body". The Protocol under Article 15.2 and the Rules of Procedure under Rule 2 provide that the legal seat of the Jury is the State of New York.  Article 15 provides that the Jury proceedings shall be governed by the U.S. Federal Arbitration Act., while Rule 2.2 of the Rules of Procedure provides that the Jury proceedings are governed by the Rules of Procedure and the U.S.

Federal Arbitration Act. Both Article 15.12 and Rule 2.2 require the Jury to act fairly and impartially provide equal treatment and a fair opportunity to be heard given the circumstances in which the decision must be made (See **Exhibits I and J**)

40. On or about July 26, 2013 the AC45 Jury was also informed by the Measurer that the BAR boat's forward kingpost was abnormally heavy with a potential AC45 Rules violation by OTUSA.

41. Also on or about July 26, 2013 OTUSA's Rules Advisor Richard Slater received an oral report from the 34th America's Cup Measurement Committee saying that one of the king posts on the BAR boat was abnormally heavy when compared to other boats in its class. (Attached as **EXHIBIT K** is a true and correct copy of "Report to the Jury by Oracle Team USA" dated August 4, 3013 and signed by Richard Slater.)

42. OTUSA then had its Shore/Build Team Manager Mark Turner conduct an internal investigation on July 27, 2013 to see whether prior to the August 2013 San Francisco Regatta "OTUSA personnel" had modified "the king post on the BAR AC45 by adding a mixture of lead and resin internally into the kingpost". Plaintiff was not interviewed by Mr. Turner on July 27, 2013. Later on July 27, 2013 Mr. Turner reported to the Measurement Committee Chairman Nick Nicholson that there were actually 2 OTUSA AC45 boats implicated. OTUSA's General Manager Grant Simmer was contacted in regard to this matter on August 4, 2013 by America's Cup Jury Chairman David Tillett and later that day a report was sent to the Jury by OTUSA's Rules Advisor Richard Slater regarding this situation.(**Exhibit K**)

43. In that report it is stated that Russell Coutts, the OTUSA CEO, was also conducting an investigation and the report discloses that

on August 4, 2013, Jury Chairman David Tillett had a conference with OTUSA's General Manager, Grant Simmer. During that conference apparently the Jury Chairman had recommended an "independent" investigator be appointed by Coutts. Subsequently OTUSA did appoint a local attorney named Lee Anne LaFrance Wallace to conduct a factual investigation on an independent basis.

44. Subsequently, OTUSA's Russell Coutts held a full team meeting when Russell Coutts threatened the entire team with immediate termination of employment if he heard of anyone discussing the cheating allegations. The shore and sailing team were told that if they even told their wives or girlfriends that they would be immediately terminated. Apparently Coutts used a very threatening tone and was ranting and raving at the team members.

45. When the meeting was over, shore team member and machinist Trevor Berry left the meeting with Simeon Tienpont and a sailing team member Brad Webb. Simeon Tienpont told Mr. Berry at that time that he had put resin in the kingpost of the BAR boat to stop the lead rattling around. (Attached as **EXHIBIT L** is a true and correct copy of the Declaration of Trevor Berry made under penalty of perjury on May 7, 2015

46. When the 34th America's Cup Measurement Committee contacted Richard Slater, the Measurer Nick Nicholson took the position that adding weight to a component such as a king post was a contravention of the Class Rules for the AC45 boats. The applicable Class Rule was "AC45 Class Rule Version 1.0" approved May 2011. (**EXHIBIT A**) Within this Class Rule, Section C is applicable. Under Rule C. 1. 2. (f.) the kingpost is identified as a component of a yacht that must comply with the building specification in force at manufacture.

Under Rule C.1.5 the kingpost as a component listed in Rule C.1.2. a kingpost cannot be modified unless permitted by the Measurement Committee.  Any maintenance can be carried out provided that the essential shape, characteristics and function of the original component is not affected. Maintenance does not have to go to the Measurement Committee. Repairs have to be reported to the Measurement Committee before the yacht next races with that Committee being satisfied that there are no advantages gained from the repair.

47. The AC34 Jury examined the kingposts on the AC45 Boat 4 and the BAR Boat and found that there was lead  added to Boat 4 which added weight to that kingpost, and that there was lead and resin added to the kingpost of the BAR boat, which added weight. The Jury's position was that this additional weight affected the essential shape, characteristic and function of these original yacht components and therefore was in contravention of Rule C.1.5.

48. However, Richard Slater, on behalf of OTUSA, was of the opinion that the lead and resin mixture that the OTUSA personnel put in the kingpost of the BAR boat did not constitute a rule violation. In this regard Mr. Slater stated to the Jury Chairman in writing on August 4, 2013: "Having the lead in the king posts does not mean that the yachts were heavier than allowed by the AC45 Class Rule. We believe that the yachts were weighed in with the additional lead. Yachts were weighed by the Measurement Committee, and any additional corrector weights were split and located on the back of the shroud bulkhead just behind the daggerboard case, as per usual."(See **EXHIBIT K**)

49. Jurors McKenzie and Willis then came to OTUSA's headquarters and

started to investigate who had added weight to the forward kingpost (also known as the Dolphin Striker) of the BAR boat. Interviews were conducted of various shore and sailing team members and management including Kyle Langford, Simeon Tienpont, plaintiff, Russell Coutts and Grant Simmer.

50. Simeon Tienpont was interviewed by Juror/Investigator McKenzie on August 13, 2013 at 6.45 pm and he admitted "**I only poured in resin to dolpkin (sic) striker**" (being the kingpost). Juror McKenzie drafted up the responses on a pre-prepared photocopied form and had Simeon Tienpont sign the form as to its accuracy. In the notes accompanying the form it is stated in Juror McKenzie's handwriting that Tienpont was asked by plaintiff and Kyle Langford to put resin in the Dolphin Striker. Elsewhere in the notes it is stated that Simeon Tienpont was "not sure Kyle saw me do it". Simeon Tienpont stated at the interview that he had talked to Russell Coutts about this matter when Russell was doing his investigation. When asked about lead being in the kingpost, Simeon Tienpont's response is less than a denial of such knowledge.(Attached as **Exhibit M** is a true and correct copy of Simeon Tienpont's Interview Notes dated August 13, 2013)

51. Neither the interview notes of plaintiff (Attached as **Exhibit** N is a true and correct copy of the Interview Notes of Matthew Mitchell dated August 14, 2013) nor the interview notes of Kyle Langford (a true and correct copy of the Interview Notes of Kyle Langford dated August 13, 2013 and attached as **Exhibit O**) corroborate Simeon Tienpont's statement implicating the involvement of plaintiff and Kyle Langford in filling the kingpost with any substance at all, or either (plaintiff or Kyle Langford) having any

knowledge of who filled the kingpost.

52. Jurors McKenzie and Willis also interviewed OTUSA's Grant Simmer on August 16, 2013 and Juror McKenzie's interview notes indicate that Simmer stated that he thought that he (i.e. Simmer) knew who had filled the kingpost [on the BAR boat]. However Juror McKenzie did not reveal in the notes what Mr. Simmer's answer was if indeed Simmer was ever asked the follow up investigatory question as to the name identity of "who he thought filled the kingpost on the BAR boat". Either Simmer was never asked this question or his response was not reflected in the interview notes. (Attached as **Exhibit R** is a true and correct copy of the Interview Notes of Grant Simmer dated August 16, 2013)

53. After these interviews were concluded, on August 19, 2013 the AC34 Jury issued Jury Notice Nos JN101 and JN103R in which the Jury made allegations of Racing Rules of Sailing Rule 69 violations of gross misconduct against others and Kyle Langford and plaintiff, **but surprisingly there were no allegations against Simeon Tienpont**. The allegations against plaintiff were that he "was involved in the addition of weight being inserted into a kingpost of at least one AC45 in contravention of the AC45 Class Rule and should have been aware this action was contrary to the AC45 Class Rule". (A true and correct copy of AC34 Jury issued Jury Notice Nos JN101 and JN103R are attached as **Exhibit P**)

54. Around the same time as the Jurors conducted interviews, OTUSA's independent investigator Lee Ann La France, Esquire also conducted an internal OTUSA investigation interviewing various persons including Simeon Tienpont, Kyle Langford and plaintiff.

55. On August 21, 2013 Jurors McKenzie and Willis and Oracle

independent investigator Lee Ann La France (who had interviewed Simeon Tienpont), and after the Jury Notices referred to above were issued, a meeting was held at Pier 80. At that meeting Ms. La France met with Jurors Willis and McKenzie along with OTUSA's Grant Simmer to discuss Ms. La France's findings on August 21, 2013. Juror McKenzie and another juror produced typed written notes of what was said at the meeting. These notes referred to as the "La France Notes" were made confidential to the Jury. (Attached as **EXHIBIT Q** is a true and correct copy of the La France Notes which have the title "Confidential to AC Jury Only") Subsequently those notes made it in to the public domain and indicate that compared with plaintiff, "Lee Ann found Simeon [Tienpont] less credible. He [Tienpont] was described as "nervous" by Ms. La France and she stated that she was surprised Simeon Tienpont was not on "our list". "Our list" referred to **EXHIBIT P** which is Jury Notice JN103R listing those on the Jury's list facing Racing Rules of Sailing Rule 69 violation allegations of gross misconduct.

56.  The La France Notes state that OTUSA's Grant Simmer was looking to take some dismissal or censure action in the following days but no reference was made to whom such action would be taken.

57.  The Jury then proceeded with hearing evidence from various members of OTUSA and from those against who Rule 69 allegations of gross misconduct were alleged. There were no allegations of gross misconduct alleged against Simeon Tienpont but he was called by the jury as a witness. Grant Simmer was not called by the jury as a witness even though he apparently knew who had added weight to the kingpost of the BAR boat. Furthermore, the man who had finalized the job list for the work to be done on the BAR boat, requiring weight

to be added to the kingpost, was not on the witness list either. That was Andrew Henderson a/k/a "Hendo" who was an experienced sailor who was on the sailing team (his second America's Cup campaign) and was the head of OTUSA's rigging department.

58.  Russell Coutts testified at the hearing but the jury failed to ask him any questions about whether he had any understanding about who had added weight to the kingpost of the BAR boat.

59. Simeon Tienpont had testified in his interview notes that "I only poured resin in the dolphin striker"…."not sure if Kyle saw **me** do it"…he then said he did not recall who was holding the kingpost (even though the kingpost is not of a size that would require it to be held by a 2nd party to fill).(**Exhibit M**) Then in testifying at the Jury's hearing on August 27, 2013 where the Jurors were examining the witnesses, Jury Chairman Willis asked Simeon Tienpont the question "What is your experience with the forward king post, if any?" Simeon Tienpont responded as follows: "And on the job list was stated that it was also that weight has to go in the king post. And I gave a hand in putting resin in the king post." (Attached as **Exhibit S** is a true and correct copy of the Transcript of the Jury's Proceedings p. 497:22-24) Simeon Tienpont then testified as to the liquid nature of the resin testifying that he had used resin before and could handle it. He testified "So it was the resin went in, and –yeah, and then it is going to sit there in the spigots." (Attached as **Exhibit T** is a true and correct copy of the Transcript of the Jury's Proceedings pp. 508: 22 to 510:24 and pp. 507:22 to 508:6)

60.  The Jurors' questions which lacked any foundation, addressed to Simeon Tienpont, suggested that plaintiff had been involved with Simeon Tienpont in putting weight in the kingpost. But Simeon

Tienpont's testimony in response to questions about whether anyone else was involved in his pouring of resin into the kingpost, when no question was pending, Simeon Tienpont testified "I couldn't tell you for a fact who were there". (Attached as **Exhibit U** is a true and correct copy of the Transcript of the Jury's Proceedings pp. 504: 21 to 505:6)

61. Then on cross examination, Simeon Tienpont admitted on cross examination that he did not know where Matthew Mitchell was when he i.e. Simeon Tienpont, put the resin in the king post. This was Simeon Tienpont's testimony when asked by plaintiff's counsel "Where was Matt when resin was going in the king post, if you can remember?" Simeon Tienpont's responsive testimony was: "As I told you before, I don't—it just doesn't struck me as a significant event, you know. And I don't remember the details of the –of how things went. We didn't –you know, I don't remember the lunch I had that day, either. We do hundreds of jobs on boats, and didn't –I didn't find anything abnormal at that time or strange. So I don't have that –those kind of details." (Attached as **Exhibit V** is a true and correct copy of the Transcript of the Jury's Proceedings pp.523:24 to 524:10)

62. Subsequently on August 29, 2013 the Jury (for some as yet undetermined reason, without there being any relevant or material evidence that plaintiff participated in filling the subject kingpost, the Jury made a finding of gross misconduct on the part of plaintiff in that: "The Jury finds that Matt participated in filling the forward kingpost, but even if he was not involved in including the additional weight Matt knew the kingpost was heavy." (Attached as **Exhibit W** is a true and correct copy of Jury Case AC31 Jury

Notice JN115R entitled Decision and Confidentiality Order dated August 29, 2013)

63. In the next couple of days text messages were exchanged between Grant Simmer's PA Luciana Corral and plaintiff's wife Andrea Mitchell. These exchanges show that Ms. Corral's response was **"Don't worry about Simeon, he's getting a team penalty"**. (Attached as **Exhibit X** is a true and correct copy of text messages exchanges dated September 3 at 7.33 am)

64. Subsequently on September 3, 2013, plaintiff was given a penalty for filling a kingpost on the BAR boat which Simeon Tienpont admitted that he filled with resin and gave no credible evidence that plaintiff was involved in this action. Plaintiff's penalty was that "Matt Mitchell is excluded from sailing on a Yacht competing in the Match for the 34th America's Cup until 4 races have been completed." (Attached as **Exhibit Y** is a true and correct copy of Jury Case AC31 Jury Notice JN116 entitled Decision and Partial Lifting of the Confidentiality Order dated September 3, 2013)

65. Plaintiff learned of the Jury's decision and the penalty from OTUSA's Luciana Corral not from OTUSA's management who knew full well that plaintiff was taking the blame for something that Simeon Tienpont had done not plaintiff. (**Exhibit X**)

66. OTUSA's CEO Russell Coutts' wife Jenny Coutts then sent plaintiff's wife Andrea Mitchell a text message saying that **"As Russell says" Matt (plaintiff) "certainly wasn't to blame"** referring to the case involving the allegations of filling the kingpost on the BAR boat. (**Exhibit X**)

67. Straight after the Jury's decision and announcement of a penalty against plaintiff for something he did not do, OTUSA's CEO through

his wife's text messages, acknowledges that plaintiff was not to blame and OTUSA's Luciana Corral states that Simeon Tienpont was going to get a penalty. Subsequently on August 6th 2014 (a year later) OTUSA's Russell Coutts admitted in writing that **Simeon Tienpont, not plaintiff, was to blame for the act of adding weight in the form of resin to the kingpost on the BAR boat.** (Attached as **EXHIBIT Z** is a true and correct copy of a statement made by Russell Coutts dated August 6th 2014)

68. OTUSA management knew that Simeon Tienpont had breached the AC45 class rule by adding weight to the kingpost on the BAR boat. But this being an action that three other team members (not plaintiff) had been suspended from employment by OTUSA for performing/masterminding on another OTUSA AC45 boat called Boat 4 (See **EXHIBIT Y**) and yet OTUSA failed to suspend/terminate Simeon Tienpont and allowed him to sail on the OTUSA race boat 17 in the 34th America's Cup meaning that the team had a rule breaking sailor in the 11 sailors who sailed that boat to victory.

69. As a consequence of OTUSA's failure to suspend or terminate Simeon Tienpont and bring his rule breaking to the attention of the Jury that they had taken down the wrong sailor, plaintiff suffered damages and injuries in taking the blame in the international yachting arena and more specifically in America's Cup sailing for a rules violation that Simeon Tienpont committed.

70. OTUSA's motive in having Simeon Tienpont sail the race boat in the 34th America's Cup demonstrated OTUSA's management's gross disregard of good sportsmanship and of plaintiff when it had a duty to disclose to the Jury in writing or otherwise that plaintiff played no part in the addition of weight to the subject kingpost and

to submit evidence to the Jury stating this. In failing to take such action plaintiff suffered damages to his reputation and has sustained subsequent economic losses.

[redacted]

73. At all material times herein, OTUSA was vicariously liable under the doctrine of *respondeat superior* ("let the master answer") for the acts and omissions of its employees and independent

contractors such as Simeon Tienpont.

74.  At all material times herein, OTUSA was liable for the acts and omissions of its independent contractors and employees under the law of agency.

### FIRST CAUSE OF ACTION

### BREACH OF CONTRACT – OTUSA's BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IMPLIED INTO ALL MARITIME CONTRACTS

75.  Plaintiff incorporates by reference each and every allegation in Paragraphs 1 through 74 as though fully set forth.

76.  At all material times herein, defendant OTUSA was a vessel owner in maritime pursuits who had entered into a maritime services contract with plaintiff, a seaman (**EXHIBIT AA)**, and OTUSA owed plaintiff a duty to act in good faith and to deal fairly in performing and enforcing that contract under the recognition of this contractual duty in *Flores v. American Seafoods Co.* 335 F. 3d 904, 913 (9th Cir. 2003). This contractual duty of good faith and fair dealing extended to requiring each party to that maritime services contract not to do anything which would injure the rights of the other party to receive the benefits of that Contract.

77.  OTUSA failed to act in good faith and deal fairly and breached its duties to do so and denied plaintiff the benefit of that contract by willfully failing to suspend and/or terminate Simeon Tienpont as a sailing team member after Tienpont admitted (on or before August 13, 2013) to adding weight in the form of resin to the kingpost of the BAR boat in violation of the AC45 Class Rule.

78.  In failing to suspend or terminate Simeon Tienpont and report such action to the AC45 Jury with respect to Jury Case AC31 prior to the Jury hearing evidence commencing on August 26, 2013, OTUSA

1    acted in bad faith and did not deal fairly with plaintiff.  OTUSA's

2    said inactions forced and transferred the blame for the adding of

3    weight to the BAR boat's kingpost wrongfully to plaintiff which if

4    OTUSA had acted in good faith by terminating or suspending Simeon

5    Tienpont for the jury to see, said wrongful transfer of blame to

6    plaintiff, the innocent party, would have been prevented.

7    79. OTUSA further failed to act in good faith and deal fairly

8    towards plaintiff and breached its duties to do so and denied

9    plaintiff the benefit of that contract by failing to report to the

10    34th America's Cup Jury in Jury Case AC31 (either prior to the Jury

11    hearing evidence commencing on August 26, 2013, during the

12    proceedings or immediately thereafter), that OTUSA's management was

13    aware that Simeon Tienpont (and not plaintiff) had added weight to

14    the BAR boat's kingpost.

15    80. OTUSA further failed to act in good faith and deal fairly and

16    breached its duties to do so and denied plaintiff the benefit of

17    that contract by possessing knowledge that Simeon Tienpont had

18    added weight to the BAR boat's kingpost, not plaintiff, and OTUSA

19    failed to report this information to the 34th America's Cup Jury in

20    Jury Case AC31, (either before or at the time of the hearing in San

21    Francisco in August/September 2013 or after it heard Simeon

22    Tienpont's evidence before the said Jury).

23    81. As a direct and proximate result of defendant OTUSA's many

24    breaches of its duty to act in good faith and to deal fairly in

25    performing and enforcing its maritime services contract with

26    plaintiff, (**EXHIBIT AA)** damages have been suffered by plaintiff who

27    continues to suffer  losses including but not limited to loss of

28    reputation associated with good sportsmanship and receipt of a

1  sports penalty, emotional and mental distress and suffering,

2  anguish, economic losses, compensatory and punitive damages in an

3  amount to be established at the time of trial but not less than

4  US$400,000.00.

5  **SECOND CAUSE OF ACTION**

6

7  **OTUSA's NEGLIGENT RETENTION of SAILOR SIMEON TIENPONT AND NEGLIGENT FAILURE TO REPORT INFORMATION TO THE AC45 JURY**

8

9  82. Plaintiff incorporates by reference each and every allegation

10  contained in Paragraphs 1 through 81 as though fully set forth.

11  83.  OTUSA owed a duty to Plaintiff to exercise reasonable care and

12  diligence in the retention of hired sailors, including Simeon

13  Tienpont, for the purposes of having sailors participate in the 34th

14  America's Cup in the San Francisco Bay in 2013.

15  84. In carrying out that duty, OTUSA had a duty to terminate or

16  suspend any sailor who it knew to have broken a class rule with

17  respect to any of the yachts that the said sailors sailed on in

18  regattas leading up to the 34th America's Cup including the

19  America's Cup World Series regattas, and the America's Cup itself,

20  particularly if OTUSA's failure to suspend or terminate a sailor

21  could negatively impact another sailor such as plaintiff.

22  85. In August 2013 OTUSA's management became aware that sailor

23  Simeon Tienpont had added resin (being weight) to the kingpost of

24  the BAR boat and that this was a violation of the AC45 Class Rule

25  Version 1.0 Rules C.1.2(f) and C.1.5.(**EXHIBIT A)** OTUSA's management

26  also became aware that plaintiff was at risk of being blamed by the

27  34th America's Cup Jury for Simeon Tienpont's actions and at risk of

28  receiving a professional sports penalty for Simeon Tienpont's

1  actions. Possessing this knowledge, OTUSA was under a duty to
2  terminate or suspend Simeon Tienpont for what it knew to be a
3  violation of a class rule and actionable misconduct under its
4  OTUSA's standard contract pursuant to which it hired sailors for the
5  34th America's Cup.
6  86.  OTUSA was also under a duty to not only suspend or terminate
7  Simeon Tienpont, but to also report such suspension/termination and
8  its basis, to the 34th America's Cup Jury investigating who had
9  added weight to the subject kingpost. OTUSA's management knew that
10  if it failed to suspend or terminate Simeon Tienpont for his
11  actions, it was placing other sailors, including plaintiff, at risk
12  of being wrongfully blamed by the 34th America's Cup Jury, for
13  Tienpont's wrongful actions and of being at risk of receiving a
14  professional sports penalty for Simeon Tienpont's actions. OTUSA's
15  duties in this regard towards plaintiff existed both prior to the
16  Jury hearing evidence, during the time that the Jury heard evidence
17  including the evidence of Simeon Tienpont, and immediately after the
18  Jury determined plaintiff to have committed the acts that OTUSA had
19  knowledge that Simeon Tienpont, and not plaintiff, had committed.
20  87.  OTUSA breached its duty to plaintiff when it negligently and
21  without exercise of reasonable care and diligence, failed to
22  terminate or suspend Simeon Tienpont and further failed to report
23  such suspension to the AC 45 Jury in determining who had added
24  weight to the kingpost of the BAR boat. OTUSA further breached its
25  duty to plaintiff duty when it negligently and without exercise of
26  reasonable care and diligence, failed to provide information that it
27  was in possession of to the AC45 jury informing the Jury that it was
28  Simeon Tienpont who filled the BAR boat's kingpost and not

1  plaintiff.

2  88. As a direct and proximate result of OTUSA's negligent retention

3  of Simeon Tienpont and its negligent failure to report the

4  information it possessed to the AC45 Jury about Simeon Tienpont

5  filling the kingpost, plaintiff was blamed for and received a

6  professional penalty for Simeon Tienpont's actions (which could

7  have been prevented by OTUSA) being harm caused to plaintiff

8  entitling plaintiff to all damages that are just and including but

9  not limited to damages for loss of reputation associated with good

10 sportsmanship and receipt of a sports penalty, emotional and mental

11 distress and suffering, anguish, economic losses, compensatory and

12 punitive damages in an amount to be established at the time of

13 trial but not less than US$400,000.00.

14                    **THIRD CAUSE OF ACTION**
                      **PUNITIVE DAMAGES**
15

16 89.  Plaintiff incorporates by reference each and every allegation

17 contained in Paragraphs 1 through 88 as though fully set forth.

18 90. At all material times herein OTUSA failed to act in good faith

19 and to deal fairly with plaintiff in performing and enforcing its

20 maritime services contract,**(EXHIBIT AA)**acting with malice by

21 willfully and consciously disregarding plaintiff's rights and

22 deliberately failing to terminate or suspend the person who filled

23 the kingpost and stand back and willfully and with malice allow

24 plaintiff to take the blame so that OTUSA could have Simeon

25 Tienpont ███████████████████ sail OTUSA's boat to victory

26 in the 34th America's Cup when he should not have been permitted to

27 sail.

28         WHEREFORE, as a legal and proximate cause of the acts or

omissions of the defendant as set forth in this complaint, plaintiff demands judgment as follows:

1. For general damages according to proof but no less than US$400.000.00;

2. For special damages according to proof;

3. For punitive damages;

4. For costs of suit incurred herein; and

5. For such other and further relief as the Court may deem proper.

BARLOW LAW

DATED: July 24, 2015          _____ *Patricia Barlow* _____
                                         Patricia Barlow
                                         Attorney for Plaintiff